MONONGAHELA POWER COMPANY, APPELLANT, *v.* PUBLIC UTILITIES
COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571,
2004-Ohio-6896.]

*Public utilities — Electric company — Competitive electric service — R.C.*
*Chapter 4928 — Decisions of Public Utilities Commission affirmed —*
*Public Utilities Commission acted without authority when it adopted a*
*stipulation that Monongahela Power Company's market-development*
*period would end early — Commission did not err in later ordering the*
*market-development period to continue.*

(No. 2004-0305 — Submitted October 26, 2004 — Decided December 30, 2004.)

APPEAL from the Public Utilities Commission of Ohio, No. 03-1104-EL-ATA.

_____

LUNDBERG STRATTON, J.

## Background

{¶ 1}  This is an appeal as of right by Monongahela Power Company
("Mon Power") from decisions of the Public Utilities Commission of Ohio in *In*
*the Matter of the Application of the Monongahela Power Co. for Approval of a*
*Market-Based Standard Serv. Offer & Competitive Bidding Process* (Oct. 22,
2003) case No. 03-1104-EL-ATA 2003 WL 22472140 (the "MBSSO case").
Mon Power was the applicant, and Industrial Energy Users-Ohio ("IEU") was an
intervening party in the MBSSO case.  IEU has also intervened as an appellee in
this appeal.

{¶ 2}  The legal backdrop for this appeal is Am.Sub.S.B. No. 3, 148 Ohio
Laws, Part IV, 7962, 7992 ("S.B.3"), codified primarily at R.C. 4928.01 et seq.,
which restructures Ohio's electric-utility industry so as to achieve retail

competition in the generation component of electric-utility service. Under S.B.3, utilities supplying electric service in Ohio were required to file transition plans for approval by the commission. R.C. 4928.31. Key to these transition plans were the unbundling of the three main components of electric service – generation, transmission, and distribution – and developing a "rate unbundling plan." R.C. 4928.31(A)(1). The unbundled retail rates, including rates for generation service, were capped and frozen for a limited transition period known as the "market development period" ("MDP"). After that period, a utility is entitled to charge market-based retail-generation rates that permit it to recover its cost of purchasing power at wholesale for resale to its customers. R.C. 4928.14.

{¶ 3} On June 22, 2000, in its restructuring case, Mon Power entered into a settlement agreement, styled a "Stipulation and Recommendation" ("the Stipulation"), with the commission's staff and with representatives of Mon Power's Ohio retail customers. The Stipulation purported to resolve all issues pertinent to Mon Power's statutorily required transition plan. The commission approved the Stipulation in its October 5, 2000 opinion and order in its case No. 00-02-EL-ETP 2000 WL 1873291 (the "ETP[1] Order").

{¶ 4} On April 24, 2003, Mon Power filed an application in the MBSSO case, seeking commission approval of a market-based standard service offer and a competitive bidding process to follow the MDP, which Mon Power asserts ended December 31, 2003. On July 24, 2003, the commission issued an order allowing Mon Power to solicit bids for power to serve its large commercial, industrial, and street-lighting customers. Mon Power then conducted the bidding process. Only two qualifying bids were received, the lower of which was from an affiliate of Mon Power.

---

1. ETP stands for Electric Transition Plan.

**{¶ 5}** On October 22, 2003, the commission issued an order in the MBSSO case ("the MBSSO Order") denying approval of the winning bid and requiring Mon Power to continue its MDP to December 31, 2005, based on a finding that neither of the controlling statutory conditions for early ending of the MDP had been satisfied. Mon Power then filed an application for rehearing, which was denied on December 17, 2003. This appeal ensued.

### MDP and its Early Ending

**{¶ 6}** While the subject of this appeal is the MBSSO Order issued on October 22, 2003, we must consider the ETP Order and the Stipulation that the commission approved in the ETP Order. In addition, we must focus on the meanings of the Stipulation's provisions.

**{¶ 7}** Central to this appeal is whether the Stipulation approved by the commission in the ETP Order shortened Mon Power's MDP with respect to its large commercial and industrial customers. The MDP is a statutorily defined term: " 'Market development period' for an electric utility means the period of time beginning on the starting date of competitive retail electric service and ending on the applicable date for that utility as specified in section 4928.40 of the Revised Code, irrespective of whether the utility applies to receive transition revenues under this chapter." R.C. 4928.01(A)(17). The starting date of competitive retail electric service was January 1, 2001. R.C. 4928.01(A)(29). Thus, Mon Power's MDP began on that date.

**{¶ 8}** The end of the MDP is also specified by statute. R.C. 4928.40(B)(2) provides:

**{¶ 9}** "For purposes of this chapter, the market development period shall not end earlier than December 31, 2005, unless, upon application by an electric utility, the commission issues an order authorizing such earlier date for one or more customer classes as is specified in the order, upon a demonstration by the utility and a finding by the commission of either of the following:

**{¶ 10}** "(a) There is a twenty per cent switching rate of the utility's load by the customer class.

**{¶ 11}** "(b) Effective competition exists in the utility's certified territory."

**{¶ 12}** Based on these statutory provisions, we conclude that Mon Power's MDP could end no later than December 31, 2005, but that it could end earlier if pertinent criteria are met.

**{¶ 13}** Mon Power argues that the commission approved an early end of its MDP as to its large commercial and industrial customers when, in the ETP Order, the commission approved the Stipulation that provided in Section IV: "For customers on the Company's Rate Schedule C with a demand greater than 300 kW, Rate Schedules CSH, D, K, P, and street lighting, *the market development period shall be a three year period and end December 31, 2003*." (Emphasis added.) Mon Power further asserts: "Section IV of the Stipulation recognized that R.C. 4928.40(B)(2) provides that the market development period may not end earlier than December 31, 2005, unless, upon application by the electric utility, the Commission authorizes an earlier termination date for one or more customer classes based upon either a finding of a 20 percent switching rate of load by the customer class or that effective competition exists in the utility's certified territory. Accordingly, in § IV of the Stipulation, Mon Power made an application to end the market development period early for its large commercial and industrial customers."

**{¶ 14}** Mon Power argues that by adopting the Stipulation in its ETP Order, the commission approved the early ending of the MDP for large commercial and industrial customers with no contingency involving future proceedings or future findings by the commission. Mon Power bases its argument on the observation that Section IV of the Stipulation provides that the MDP for small (300kW and below) commercial customers was not shortened and that, in order to end the MDP for those customers early, Mon Power would have to make

separate application in the future under R.C. 4928.40(B)(2): "For either Schedule B customers and/or Schedule C customers having demands of 300 kW and below, the market development period can be terminated at any time by the Company making a filing with the Commission showing a 20% switching rate or effective competition." Mon Power argues that since the Stipulation contains a specific qualification of further commission approval to shorten the MDP for small commercial customers but does not impose such a qualification on Mon Power to shorten the MDP for its large commercial and industrial customers, no such qualification exists.

{¶ 15} Mon Power argues further that the only qualification on the commission's approval of the transition plan and the Stipulation in the ETP case was final approval of Mon Power's compliance tariffs and that Mon Power distributed its proposed compliance tariffs to all of the parties in the ETP case, including the commission's staff, for their review. The tariff sheets distributed for review and subsequently approved by the commission "expressly provided that the default retail electric generation services offered to large commercial and industrial customers would end December 31, 2003 – at the end of the market development period for those customers."

{¶ 16} The commission and intervening appellee IEU contend that the commission's approval of Section IV of the Stipulation in the ETP Order did not have the effect of authorizing a shortened MDP for Mon Power's large commercial and industrial customers. They contend that the commission's approval not only did not have that effect, it simply could not have had that effect.

{¶ 17} They argue correctly that the *only* way the MDP can be ended before December 31, 2005, is by compliance with R.C. 4928.40(B)(2). That statutory provision contains four steps: (1) an application by the electric utility to shorten the MDP; (2) a demonstration by the utility that (a) there is a 20 percent switching rate of the utility's load by the customer class or (b) effective

5

competition exists in the utility's service territory; (3) based on the utility's demonstration, a commission finding of the requisite switching rate or effective competition; and (4) based on such finding, a commission order authorizing a shortened MDP.

{¶ 18} The commission readily concedes that Section IV of the Stipulation evidences that Mon Power took the first step to shorten its MDP for large commercial and industrial customers. In Section IV of the Stipulation, Mon Power made application to the commission for approval of a shortened MDP: "By this Stipulation, Monongahela Power, supported by the other Signatory Parties, applies to the Commission for authorization of a market development period termination date for industrials and large commercial customers of December 31, 2003, based upon agreement to forego the recovery of transition costs beyond that date (see Ohio Revised Code §4928.38)."

{¶ 19} The next requisite statutory step is a demonstration by the utility that either effective competition exists or there is a 20 percent customer switching rate. However, there is nothing in the Stipulation or in the ETP Order indicating that Mon Power made a showing of the existence of the requisite competition or switching rate. Indeed, Mon Power could not have made such a showing because the ETP Order was issued October 5, 2000, almost three months prior to the starting date of competitive retail electric service on January 1, 2001, as provided in R.C. 4928.01(A)(29). Thus, at the date of the ETP Order, there was no competitive retail electric service. Mon Power could not have demonstrated the existence of effective competition, and the commission could not have made a finding of the existence of any competition, much less the existence of *effective* competition. Moreover, at the date of the ETP Order, the certified-territory law was still in effect, outlawing competition and making it illegal for customers to switch to other providers of electric-generation service.

**{¶ 20}** The commission argues that the statutorily required demonstration of a 20 percent switching rate or the existence of effective competition speaks in the present tense. Mon Power, on the other hand, argues that the second paragraph of R.C. 4928.40(A) provides the factors that the commission must consider in determining the subjective condition of "[e]ffective competition" as used in R.C. 4928.40(B) and that each of those factors is capable of determination before the start date for actual competition. According to Mon Power, "[i]ndeed, two of the three factors – transition costs and shopping incentives – are statutorily required to be addressed in the utility's transition plan. *See* R.C. 4928.34(A)(12); R.C. 4928.37; Ohio Admin. Code § 4901:1-20-03."

**{¶ 21}** Mon Power argues that, considering the factors mentioned in the second paragraph of R.C. 4928.40(A), the commission could and, in fact, did determine in the Stipulation approved in the ETP Order that the effective competition prescribed in R.C. 4928.40(B) could be determined before the start of actual competition.

**{¶ 22}** As to the requisite switching or effective competition, we consider the commission's position more plausible and persuasive than Mon Power's.

**{¶ 23}** Mon Power's position is the only one it can take as to the requirements of R.C. 4928.40(B). Yet it ignores the fact that R.C. 4928.40(B) contains two requisites. The first is that a 20 percent switching rate or effective competition must be *demonstrated* by the utility. Mon Power has failed to show how it made any such demonstration either in the Stipulation approved in the ETP Order or by way of testimony or evidence presented in the proceedings resulting in the MBSSO Order. The second requisite is a finding by the commission of a 20 percent switching rate or effective competition. The commission made no finding about the 20 percent switching rate or competition in its ETP Order, and in its MBSSO Order, it made specific findings that they did not occur.

**{¶ 24}** Therefore, we conclude as follows: The *only* way that Mon Power's MDP for large commercial and industrial customers could have been ended before December 31, 2005, was by compliance with R.C. 4928.40. Furthermore, although Mon Power properly applied to the commission for authority to end the MDP at an earlier date, Mon Power failed to demonstrate to the commission that the requisite switching rate or effective competition had been or would be achieved by any given date, and the commission did not find that the requisite switching rate or effective competition had been achieved by December 31, 2003. Indeed, in the MBSSO Order, the commission specifically found that the requisite switching rate or effective competition had not been achieved.

**{¶ 25}** Mon Power professes that as of the date of the ETP Order and continuing to the present, its corporate belief has been that the ETP Order had the effect of ending its MDP for large commercial and industrial customers as of December 31, 2003. We are also convinced that the commission believed that its ETP Order had that effect. The commission said so in the ETP Order. Moreover, the commission approved Mon Power's compliance tariffs that said so, and on the day of the ETP Order, the commission issued a press release that contained the following statement: "Under the terms of the stipulation, which was adopted in the order, the market development period ends for large customers (industrial and large commercial) on December 31, 2003, and for small customers (residential and small commercial) on December 31, 2005."

**{¶ 26}** Nevertheless, to the extent that Section IV of the Stipulation approved by the commission in the ETP Order can be considered an order authorizing the early end of Mon Power's MDP, that order was premature. It was based upon an optimistic assumption that the requisite levels of the switching rate or effective competition would be achieved by December 31, 2003, an assumption that proved to be unwarranted, making any such order ending the MDP

unenforceable because the order exceeded the statutory authority of the commission.

{¶ 27} We conclude that, as a matter of law, the ETP Order did not end Mon Power's MDP as to its large commercial and industrial customers before December 31, 2005.

## Mon Power's Other Arguments

{¶ 28} Mon Power argues that the commission was bound by its decision in the ETP Order that Mon Power's MDP for its large commercial and industrial customers would end on December 31, 2003. Therefore, asserts Mon Power, the commission erred when it extended the MDP in the MBSSO Order. Mon Power's argument that the commission was bound by the ETP Order is based on estoppel, the Contracts Clause of the United States Constitution, and issue preclusion. Application of these doctrines to the facts, however, is based upon the premise that the ETP Order created a legally binding early termination of Mon Power's MDP for its large commercial and industrial consumers. Since we have determined that the commission had no authority to enter into such an agreement contrary to the statute, the consideration of these theories is moot. Therefore, none of the legal doctrines suggested by Mon Power have application under the facts before us.

## Standard of Review

{¶ 29} R.C. 4903.13 provides that a commission order shall be reversed, vacated, or modified by this court only if, upon consideration of the record, the court finds the order to be unlawful or unreasonable. Under this statutory standard, "this court will not reverse or modify a PUCO decision as to questions of fact where the record contains sufficient probative evidence to show the PUCO's determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty." *AT&T Communications of Ohio, Inc. v. Pub. Util.*

*Comm.* (2000), 88 Ohio St.3d 549, 555, 728 N.E.2d 371, citing *MCI Telecommunications Corp. v. Pub. Util. Comm.* (1988), 38 Ohio St.3d 266, 268, 527 N.E.2d 777. This court has consistently refused to substitute its judgment for that of the commission on evidentiary matters. *AK Steel Corp. v. Pub. Util. Comm.* (2002), 95 Ohio St.3d 81, 84, 765 N.E.2d 862. As the court noted in *AK Steel* (a case that also addressed the electric-utility transition issues for a different electric utility), the appellant bears the burden of demonstrating that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record. Id. at 86, 765 N.E.2d 862. This burden is difficult to sustain because the court has consistently found it proper to defer to the commission's judgment in matters that require the commission to apply its specialized expertise and discretion, as it did below, with regard to factual matters now on appeal. *Cincinnati Bell Tel. Co. v. Pub. Util. Comm.* (2001), 92 Ohio St.3d 177, 179-180, 749 N.E.2d 262; *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.* (1990), 51 Ohio St.3d 150, 154, 555 N.E.2d 288; *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1976), 46 Ohio St.2d 105, 107-108, 75 O.O.2d 172, 346 N.E.2d 778.

{¶ 30} " Due deference should be given to statutory interpretations by an agency that has accumulated substantial expertise and to which the General Assembly has delegated enforcement responsibility." *Weiss v. Pub. Util. Comm.* (2000), 90 Ohio St.3d 15, 17-18, 734 N.E.2d 775, citing *Collinsworth v. W. Elec. Co.* (1992), 63 Ohio St.3d 268, 272, 586 N.E.2d 1071.

{¶ 31} To the extent that Mon Power's assertions of error are directed at factual determinations of the commission, Mon Power has failed to show that the record so lacked sufficient probative evidence as to show misapprehension, mistake, or willful disregard of duty on the part of the commission or that the commission's determinations were against the manifest weight of the evidence. To the extent that Mon Power's assertions of error are directed at the

commission's exercise of discretion or judgment based on the commission's expertise, Mon Power has failed to convince us that this court should substitute its judgment for that of the commission.

## Conclusion

**{¶ 32}** Based on the foregoing, we conclude that the decisions of the commission were reasonable and lawful, and we therefore affirm them.

Decisions affirmed.

RESNICK, F.E. SWEENEY, O'CONNOR and O'DONNELL, JJ., concur.

MOYER, C.J., dissents.

PFEIFER, J., dissents.

_____

**MOYER, C.J., dissenting.**

**{¶ 33}** I respectfully dissent from the majority's conclusion that the Public Utilities Commission lacked the authority to make an order ending Monongahela Power's ("Mon Power's") market-development period ("MDP") as to its large commercial and industrial customers on December 31, 2003. The commission had the authority, pursuant to R.C. 4928.40, to make such an order and did in fact make such an order when it approved the Stipulation and Recommendation ("the Stipulation") in its October 5, 2000 Opinion and Order (the "ETP Order").

**{¶ 34}** Compliance with R.C. 4928.40(B)(2)[2] is required before a utility company's MDP can be terminated prior to December 31, 2005. As the majority states, "That statutory provision contains four steps: (1) an application by the

---

2.. **{¶a}** R.C. 4928.40(B)(2) provides:

   **{¶b}** "For purposes of this chapter, the market development period shall not end earlier than December 31, 2005, unless, upon application by an electric utility, the commission issues an order authorizing such earlier date for one or more customer classes as is specified in the order, upon a demonstration by the utility and a finding by the commission of either of the following:

   **{¶c}** "(a) There is a twenty per cent switching rate of the utility's load by the customer class.

   **{¶d}** "(b) Effective competition exists in the utility's certified territory."

electric utility to shorten the MDP; (2) a demonstration by the utility that (a) there is a 20 percent switching rate of the utility's load by the customer class or (b) effective competition exists in the utility's service territory; (3) based on the utility's demonstration, a commission finding of the requisite switching rate or effective competition; and (4) based on such finding, a commission order authorizing a shortened MDP."

{¶ 35} The majority finds that Mon Power took the first step[3] but ultimately concludes that the other three steps were not taken and in fact could not have been taken in the instant case. According to the majority, "There is nothing in the Stipulation or in the ETP Order indicating that Mon Power made a showing of the existence of the requisite competition* * *." Moreover, the majority reasons that Mon Power could not have demonstrated the existence of effective competition because the ETP Order was issued before the starting date of competitive retail electric service,[4] at a time when the certified-territory law—a law that outlawed competition and customer switching—was in effect.

{¶ 36} However, in reaching this conclusion, the majority fails to account for the explanation of "effective competition" that is set forth in R.C. 4928.40(A). R.C. 4928.40(A) provides:

{¶ 37} "Factors the commission shall consider in prescribing the expiration date of the utility's market development period and the transition charge for each customer class and rate schedule of the utility include, but are not

---

3. Mon Power applied to the commission for approval of a shortened MDP in Section IV of the Stipulation. That section provides: "By this Stipulation, Monongahela Power, supported by the other Signatory Parties, applies to the Commission for authorization of a market development period termination date for industrials and large commercial customers of December 31, 2003, based upon the agreement to forego the recovery of transition costs beyond that date (see Ohio Revised Code § 4928.38)."

4. R.C. 4928.01(A)(29) provides that the " '[s]tarting date of competitive retail electric service' means January 1, 2001, except as provided in division (C) of this section." This date marks the beginning of the MDP. See R.C. 4928.01(A)(17).

limited to, the total allowable amount of transition costs of the electric utility as determined under section 4928.39 of the Revised Code; the relevant market price for the delivered supply of electricity to customers in that customer class and, to the extent possible, in each rate schedule as determined by the commission; and such shopping incentives by customer class as are considered necessary to induce, at the minimum, a twenty per cent load switching rate by customer class halfway through the utility's market development period but not later than December 31, 2003."

{¶ 38} The three factors enumerated in R.C. 4928.40(A) provide guidance as to what constitutes "effective competition." Significantly, each of these factors is capable of determination before the starting date of competitive retail electric service. Moreover, two of the factors—transition costs and shopping incentives— must be addressed in the utility's transition plan. See R.C. 4928.34(A)(12); R.C. 4928.37(A)(1); Ohio Adm.Code 4901:1-20-03.

{¶ 39} Thus, R.C. 4928.40(A) negates the conclusion that a demonstration of effective competition cannot be made before the starting date of competitive retail electric service. Pursuant to R.C. 4928.40(A), a utility need not wait for the MDP to produce desired competitive results; rather, the utility can demonstrate the existence of effective competition by showing that a supporting *framework* for competition is in place. This demonstration can be made as part of the utility's transition plan. Therefore, the commission has the authority to prospectively end the MDP at the time it approves the utility's transition plan and to do so based on the utility's inclusion of a framework for competition in the transition plan.

{¶ 40} In the instant case, Mon Power demonstrated that effective competition, as that term is defined in R.C. 4928.40(A), existed in its certified territory. Section IV of the Stipulation states that the basis for Mon Power's application for termination of the MDP as of December 31, 2003, was its "agreement to forego the recovery of transition costs beyond that date." The

"total allowable amount of transition costs" is one of the factors set forth in R.C. 4928.40(A) that the commission is required to consider in determining whether effective competition exists in the utility's certified territory. Thus, R.C. 4928.40(A) directly supports the proposal in the Stipulation that the early end of the MDP be authorized based on Mon Power's agreement to forgo transition costs.

{¶ 41} Next, the commission met the third requirement of 4928.40(B)(2) and found that effective competition existed in Mon Power's certified territory. In the ETP Order, the commission recognized that the Stipulation altered Mon Power's transition plan by terminating both the MDP and regulatory-transition charges for Mon Power's industrial and large commercial customers as of December 31, 2003. The commission also acknowledged that the Stipulation "substantially reduces the amount of regulatory assets that the company will recover through its RTC [regulatory transition charge]."

{¶ 42} After making these acknowledgments, the commission, in a section of the ETP Order entitled "Findings of Fact and Conclusions of Law," found, "The company's transition plan, as modified by the Stipulation, satisfies the requirements of S.B. 3," which includes R.C. 4928.40(B)(2). By finding that the Stipulation complied with the relevant statutory provisions, the commission found that Mon Power's agreement to forgo recovery transition costs, as set forth in the Stipulation, was a sufficient basis for prescribing an early end to the MDP.

{¶ 43} Finally, the ETP Order states that "[Mon Power's] transition plan and Stipulation filed on January 3, 2000, and June 22, 2000, are approved to the extent set forth in this Opinion and Order." By approving the Stipulation, the commission approved Mon Power's application in Section IV of the Stipulation to terminate the MDP for certain of its customer classes on December 31, 2003. Therefore, the issuance of the ETP order satisfied the fourth requirement of R.C. 4928.40(B)(2).

{¶ 44} Because the requirements set forth in R.C. 4928.40(B)(2) were satisfied, I would hold that the commission authorized the early termination of Mon Power's MDP with respect to its large commercial and industrial customers as part of the ETP Order.

_____

**PFEIFER, J., dissenting.**

{¶ 45} I would hold that the Public Utilities Commission ("PUCO") had the authority to and did enter into a stipulation with Monongahela Power Company ("Mon Power") to end early the market-development period for certain of Mon Power's customer classes. The fact that PUCO does not like the deal it entered into does not mean it was without authority to enter into it. Still, despite the result, it is refreshing to see PUCO admit that its power has limits.

_____

Gary A. Jack; Porter, Wright, Morris & Arthur, L.L.P., Kathleen M. Trafford, Daniel R. Conway, and Jay A. Yurkiw, for appellant.

Jim M. Petro, Attorney General, Duane W. Luckey, Senior Deputy Attorney General Thomas G. Lindgren and Thomas W. McNamee, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

McNees, Wallace & Nurick, L.L.C., Samuel C. Randazzo, Lisa G. McAlister and Daniel J. Neilsen, for intervening appellee, Industrial Energy Users-Ohio.

_____