**[This decision has been published in *Ohio Official Reports* at 95 Ohio St.3d 81.]**

AK STEEL CORPORATION, APPELLANT, *v*. PUBLIC UTILITIES COMMISSION OF

OHIO ET AL., APPELLEES.

[Cite as *AK Steel Corp. v. Pub. Util. Comm*., 2002-Ohio-1735.]

*Public Utilities Commission—Electric utilities—Competition in retail electric*
*market as required by 1999 Am.Sub.S.B. No. 3—R.C. 4928.31—*
*Commission's order approving stipulations among parties relating to*
*CG&E's transition plan and the plan itself affirmed, when.*

(No. 00-2092—Submitted November 14, 2001—Decided April 17, 2002.)

APPEAL from the Public Utilities Commission of Ohio, Nos. 99-1658-EL-ETP,

99-1659-EL-ATA, 99-1660-EL-ATA, 99-1661-EL-AAM, 99-1662-EL-AAM,

and 99-1663-EL-UNC.

————————————

**MOYER, C.J.**

{¶ 1} In 1999 Am.Sub.S.B. No. 3, the General Assembly adopted a comprehensive statutory scheme to facilitate and encourage development of competition in the retail electric market. Most of the provisions of the Act became effective on October 5, 1999. Enacted as part of S.B. 3, R.C. 4928.31 requires each electric utility to file with the Public Utilities Commission of Ohio a transition plan for the company's provision of competitive electric service in Ohio. Transition plans are required to contain plans for rate unbundling, corporate separation, operational support, employee assistance, and consumer education. On December 28, 1999, CG&E filed its proposed transition plan, together with attachments, supporting testimony, and other information. After CG&E's filing, numerous parties intervened, including appellant AK Steel Corporation. AK Steel is a large industrial customer of CG&E that had purchased electric service under a commission-approved contract that expired December 31, 2000. Some of the

parties filed objections to the proposed plan. CG&E and other parties, including AK Steel, filed written testimony. Evidentiary hearings were held, and briefs were filed by various parties.

{¶ 2} In May 2000, a stipulation and recommendation on CG&E's proposed transition plan was filed. The stipulation represented an agreement among the many parties to the stipulation of all issues relating to CG&E's transition plan. Those parties include residential, commercial, and industrial consumers of CG&E's retail electric service or their representatives, energy marketers, organized labor, business and institutional associations, and local government. AK Steel did not sign the stipulation. In fact, in the proceedings before the commission, it presented testimony and filed briefs in opposition to some of the provisions of the stipulation. The commission's August 31, 2000 opinion and order approved the stipulation. After its application for rehearing was denied by the commission, AK Steel filed this appeal as of right.

{¶ 3} The court allowed intervention by CG&E and OCC, and both have participated in this appeal as appellees.

I

Adoption of the Stipulation

{¶ 4} In its order approving the stipulation, the commission observed that Ohio Adm.Code 4901-1-30 authorizes parties to commission proceedings to enter into stipulations. The commission further observed, "Although not binding on the Commission, the terms of such agreements are accorded substantial weight. See, *Consumer[s'] Counsel v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 123, at 125 [592 N.E.2d 1370], citing *Akron v. Pub. Util. Comm.* (1978), 55 Ohio St.2d 155 [9 O.O.3d 122, 378 N.E.2d 480]."

{¶ 5} The commission determined that the ultimate issue for its consideration was whether the stipulation was reasonable and, thus, should be approved. The commission applied the following criteria in its determination of

reasonableness: "(1) Is the settlement a product of serious bargaining among capable, knowledgeable parties? (2) Does the settlement, as a package, benefit ratepayers and the public interest? (3) Does the settlement package violate any important regulatory principle or practice?" The commission noted that this court has endorsed the commission's analysis of reasonableness using these three criteria. See *Consumers' Counsel v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 123, 126, 592 N.E.2d 1370, 1373.

{¶ 6} Based on its conclusion that all three criteria were met, the commission approved the stipulation and the transition plan as modified by the stipulation. AK Steel challenges that approval, asserting that the third criterion was not met, because of errors committed by the commission. The commission argues to the contrary that it committed no such errors and underscores the fact that it made an explicit finding in its order that the third criterion had been met.

{¶ 7} We conclude that the commission's finding has adequate record support. Therefore, we affirm the commission's approval of the stipulation and plan.

II

Unbundled Transmission Rate

{¶ 8} R.C. 4928.31(A)(1) requires that transition plans for competitive service contain rate-unbundling plans that separate existing bundled utility rates into their cost-based functional components (including generation, transmission, and distribution of electricity) in accordance with R.C. 4928.34(A)(1) to (7) and commission rules. The parties to the stipulation agreed that the unbundled transmission component of CG&E's transition plan satisfied the requirements of R.C. 4928.31(A)(1).

{¶ 9} However, AK Steel objects to CG&E's unbundling plan on the basis that CG&E's functional cost-of-service study that is used to unbundle rates assigns distribution costs to customers of transmission service (Rate Schedule TS) even

though they receive electricity directly from the high-voltage transmission system and do not use the lower-voltage distribution system, because the unbundling plan is based on the cost-of-service study submitted by CG&E in its most recent rate case in 1992, commission case No. 92-1464-EL-AIR, in which rates were bundled.

{¶ 10} AK Steel argues that use of this 1992 study without further breakdown of costs to various functions produces absurd results. For example, AK Steel says that $473,979 of overhead is attributed to distribution in Rate Schedule TS (applied to only thirty-four customers) in support of only $15,746 worth of actual distribution equipment, in the form of meters; that $485,569 of billing expense is assigned to Rate Schedule TS to serve thirty-four customers, while $370,077 is assigned to the Secondary Distribution/Small class to support billing for thirty-one thousand customers; and that just over one-third of a total of $6.2 million in property taxes is attributed to distribution property for the Rate Schedule TS class, comprising only the $15,746 of meters.

{¶ 11} The commission concedes that the rate-unbundling plan as applied to the Rate Schedule TS class did not achieve perfection. The commission, however, argues that it produced acceptable results and equal treatment within the class. The commission considered all of the arguments made on this appeal and found that the unbundling plan to which most of the parties agreed was reasonable and consistent with R.C. 4928.34. It further found that adoption of AK Steel's recommendations for further refinement of the 1992 rate case cost-of-service study could cause rates to exceed the cap set forth in R.C. 4928.34(A)(6) and would shift costs among rate classes "in a manner not intended by the legislature." The commission also found that in the unbundling process, CG&E was required by S.B. 3 to use CG&E's 1992 cost-of-service study. Moreover, the commission stated in the order, "Although certain allocations of costs may appear to be incongruous, we find that CG&E has followed the statutory scheme in unbundling its rates."

**{¶ 12}** The order demonstrates that, as to the issue of the unbundled transmission rate, the commission considered the same arguments and acknowledged the same evidentiary matters that AK Steel has urged here. As the court said recently in *Cincinnati Bell Tel. Co. v. Pub. Util. Comm.* (2001), 92 Ohio St.3d 177, 179-180, 749 N.E.2d 262, 264-265:

**{¶ 13}** "We have consistently refused to substitute our judgment for that of the commission on evidentiary matters. *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm.* (1999), 86 Ohio St.3d 53, 711 N.E.2d 670*; Dayton Power & Light Co. v. Pub. Util. Comm.* (1983), 4 Ohio St.3d 91, 4 OBR 341, 447 N.E.2d 733; *Columbus v. Pub. Util. Comm.* (1959), 170 Ohio St. 105, 10 O.O.2d 4, 163 N.E.2d 167. Traditionally, we have deferred to the judgment of the commission in instances involving the commission's special expertise and its exercise of discretion, when the record supports either of two opposing positions. *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.* (1990), 51 Ohio St.3d 150, 555 N.E.2d 288*; Dayton Power & Light Co. v. Pub. Util. Comm.* (1962), 174 Ohio St. 160, 21 O.O.2d 427, 187 N.E.2d 150. We have held that we will reverse a commission order only where it is unreasonable, unlawful, or against the manifest weight of the evidence or shows misapprehension, mistake, or willful disregard of duty. *Cincinnati Gas & Elec. Co.*, 86 Ohio St.3d 53, 711 N.E.2d 670; *Ohio Edison Co. v. Pub. Util. Comm.* (1992), 63 Ohio St.3d 555, 589 N.E.2d 1292; see R.C. 4903.13."

**{¶ 14}** Based on the record below and the commission's findings of fact and conclusions of law set forth in its order, the commission's decision as to CG&E's unbundled transmission rate is not unreasonable, unlawful, or against the manifest weight of the evidence.

III

Transition Costs and Transition Revenues

**{¶ 15}** AK Steel claims that under the transition plan CG&E's transition revenue may exceed its transition costs. It argues that R.C. 4928.34(A)(12) requires that to approve the stipulated transition plan, the commission must find that the transition revenues equal the transition costs. However, the plain language of R.C. 4928.34 requires only that a utility be allowed an opportunity to collect the transition costs allowed by the commission under R.C. 4928.39 through the transition charges determined by the commission under R.C. 4928.40.

**{¶ 16}** The commission in its order observed that CG&E is entitled only to an opportunity to collect its transition charges and that there is no guarantee under R.C. 4928.34(A)(12) that transition revenues will equal transition costs. The commission also observed that many factors will determine whether CG&E will recover more or less than its approved transition costs, concluding as follows: "Consequently, we do not believe that the stipulation is unreasonable or in violation of Section 4928.34(A)(12), Revised Code, because the stipulation does not guarantee that the Company will recover no more than the projected transition costs."

**{¶ 17}** Our reading of R.C. 4928.34 is consistent with the commission's application of the statute to the stipulation, and, therefore, we reject AK Steel's argument.

IV

Specific Transition Costs

**{¶ 18}** AK Steel has attacked the commission-approved determination of four of CG&E's transition costs[1]: (1) the shopping credit cost, (2) the purchased

---

1. These costs include those deferred and recovered as regulatory assets through a regulatory transition charge ("RTC"). "Regulatory assets" is defined in R.C. 4928.01(26) as unamortized expenses that are capitalized or deferred only by virtue of commission action.

power cost, (3) the attorney fees of CG&E and other parties to the stipulation, and (4) costs of transferring its generating units to an affiliated exempt wholesale generator.

{¶ 19} The commission's order contains a thorough discussion of AK Steel's objections to the determinations of these four transition costs, referring to relevant testimony and other evidence. In its conclusion of that discussion, the commission found that the challenged transition costs satisfied the criteria of R.C. 4928.39 and were fully supported by the evidence.

{¶ 20} The court will not reverse or modify a decision of the commission as to a question of fact where there is sufficient probative evidence to show that the commission's decision is not against the manifest weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *E.g., AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.* (2000), 88 Ohio St.3d 549, 555, 728 N.E.2d 371, 376. The burden is on the appellant to show that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the evidence. Our review of the record causes us to conclude that AK Steel has failed to meet this heavy burden.

{¶ 21} Therefore, we affirm the commission's allowance of the transition costs challenged by AK Steel.

V

Alleged Illegal Discrimination or Preference

{¶ 22} The commission acknowledges in its order the following: Shopping incentives provided in the stipulation in the form of shopping credits are higher in each customer class for the first twenty percent of the load of that class that switches to an electric marketer. The regulatory transition charge ("RTC"; see fn. 1) for residential customers will end December 31, 2008, two years earlier than for other classes of customers. The stipulation guarantees to residential customers a five-

year market development period ("MDP"), while the MDP for other classes of customers could end sooner.

{¶ 23} AK Steel contends that these differences are unreasonable and in violation of R.C. 4905.33 and 4905.35. Those statutes prohibit certain discriminatory practices:

{¶ 24} "No public utility shall directly or indirectly, or by any special rate, rebate, drawback, or other device or method, charge, demand, collect or receive from any person, firm, or corporation a greater or lesser compensation for any services rendered, or to be rendered, * * * than it charges, demands, collects, or receives from any other person, firm, or corporation *for doing a like and contemporaneous* service under substantially the same circumstances and conditions." (Emphasis added.) R.C. 4905.33(A).

{¶ 25} "No public utility shall make or give any undue or unreasonable preference or advantage to any person, firm, corporation, or locality or subject any person, firm, corporation, or locality to any *undue* or *unreasonable* prejudice." (Emphasis added.) R.C. 4905.35(A).

{¶ 26} As we have held, R.C. 4905.33 "does not prohibit rate discrimination *per se*; rather, it prohibits charging different rates when the utility is performing '* * * a like and contemporaneous service under substantially the same circumstances and conditions. * * *' R.C. 4905.35 is to the same effect, and prohibits '* * * unreasonable prejudice or disadvantage * * *.'

{¶ 27} "Absolute uniformity in rates or prices is not required by statute or case law. A reasonable differential or inequality of rates may occur where such differential is based upon some actual and measurable differences in the furnishing of services to the consumer." *Mahoning Cty. Townships v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 40, 43-44, 12 O.O.3d 45, 47, 388 N.E.2d 739, 742.

{¶ 28} The commission specifically found that the structure of the shopping credits, the MDPs, and the RTC recovery periods do not violate R.C. 4905.33 or

R.C. 4905.35 and concluded as a matter of law that R.C. 4928.37(B) and R.C. 4928.40(A) authorize the commission to approve the shopping incentives set forth in the stipulation. The commission further found that although customers who take the early initiative to shop for an alternate supplier of generation will benefit from their actions, the benefit does not amount to undue preference or discrimination, because all customers will have an equal opportunity to take advantage of the shopping incentives. The commission found that it was not discriminatory to have two different periods for recovery of the RTC, one for residential and one for nonresidential customers, inasmuch as the rates, incentives, and shopping credits vary between these groups. Last, the commission found that R.C. 4928.40 expressly permits the commission to authorize the ending of the MDP prior to December 1, 2005, based on the switching rate by a particular class of customer, and that it could do so in advance in its order approving the plan.

{¶ 29} We agree with the commission's findings of fact and conclusion of law and will not disturb them. We therefore affirm the commission.

VI

Shopping Credits as Switching Incentives

{¶ 30} CG&E's commission-approved transition plan includes a shopping incentive as contemplated by R.C. 4928.40 in the form of shopping credits (against the RTC) to the first twenty percent of shopped-for residential load. AK Steel raises several arguments against the shopping credits.

{¶ 31} First, AK Steel asserts that the shopping credit device is an improper discounting of the RTC in violation of R.C. 4928.37(A)(3). R.C. 4928.37(A)(3) provides, "The transition charge shall not be discounted by any party." However, the shopping credit is not a discount of the RTC by CG&E. It is what it says it is, a credit against the RTC as established in the transition plan approved by the commission.

**{¶ 32}** AK Steel next argues that the shopping credit bypasses the RTC in violation of R.C. 4928.37(A)(1)(b). However, there is no bypassing of the RTC. No shopping customer bypasses the RTC, albeit the first twenty percent of residential customers (by load) who shop for alternate electric generation will pay the RTC as reduced by the shopping credit.

**{¶ 33}** Finally, AK Steel complains that the shopping credit results in an RTC of less than zero in violation of the last sentence of R.C. 4928.40(A). However, the record reveals no negative transition charges. Moreover, the commission explicitly stated in its order that it did "not believe that the development of a shopping incentive should be viewed as creating an RTC of less than zero."

**{¶ 34}** We find that the commission did not err by approving the shopping credits of the transition plan, and we hereby affirm the commission's approval of them.

Summary and Conclusions

**{¶ 35}** AK Steel has presented to the court a scattershot appeal. As to certain claimed errors, AK Steel asserted that the commission's determinations or approvals are unsupported by or contrary to the evidence. Yet those determinations and approvals were in fact supported by sufficient probative evidence, and the court will not reweigh the evidence or reverse the commission in such circumstances.

**{¶ 36}** As to other claimed errors, AK Steel asserted that various statutory provisions required the commission to consider matters other than those considered by it or to make findings and reach conclusions otherwise than it did. AK Steel also asserted that certain of the commission's approvals resulted in violations of various statutory proscriptions. As to all of its statutory arguments, AK Steel proved to be unconvincing and, in some instances, in error.

**{¶ 37}** AK Steel, as appellant, has not carried its burden of demonstrating that the commission committed reversible error. Moreover, even if AK Steel had

sustained its burden, it failed to demonstrate that it has been or will be prejudiced by the error.

{¶ 38} We therefore affirm the commission in all respects.

*Order affirmed.*

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

COOK, J., concurs in judgment.

PFEIFER and LUNDBERG STRATTON, JJ., concur in part and dissent in part.

————————————

**LUNDBERG STRATTON, J., concurrring in part and dissenting in part.**

{¶ 39} I concur with the majority opinion, except I dissent to Part II, which is entitled "Unbundled Transmission Rate." I believe that the majority's approval of CG&E's unbundling plan is unreasonable with regard to Rate Schedule TS customers, which includes AK Steel. For example, AK Steel presented evidence that CG&E's unbundled rate plan unreasonably assigns costs to Rate Schedule TS customers. Specifically, AK Steel showed that although Rate Schedule TS customers use only $15,746 worth of distribution equipment, $473,979 was attributed to their overhead distribution costs. In addition, the commission assigned over $2,000,000 in property taxes to distribution property associated with the Rate Schedule TS customers, yet the actual distribution property used by that class consisted of meters worth only $15,746. Finally, the commission assigned a billing expense of $485,569 to the Rate Schedule TS customers to serve thirty-four customers, yet assigned only $370,077 to the Secondary Distribution/Small class customers to support billing thirty-one thousand customers. The commission did not dispute these numbers.

{¶ 40} As the majority points out, the commission admits that it did not achieve perfection. Even the commission conceded "certain allocations of costs * * * appear to be incongruous" but found that to determine a more appropriate allocation of the costs would violate R.C. 4928.34(A)(6), which required

unbundling the rate that was in effect the day before the effective date of deregulation. The commission further defended its position by maintaining that it provided equal treatment within the class and that further cost shifts among the classes would cause it to exceed the cap set by R.C. 4928.34(A)(6).

{¶ 41} Admittedly, R.C. 4928.34(A)(6) required the unbundling plan to be based on the 1992 cost-of-service study from commission case No. 92-1464-EL-AIR because those were the rates in existence the day before the effective date of deregulation. However, the commission was also under an obligation to fix reasonable rates. R.C. 4909.15. The numbers on their very face, as extreme as they are, defeat any claim of reasonableness.

{¶ 42} The commission argued that AK Steel's assertion that the unbundled rate was vastly overinflated when compared to actual costs was flawed because it was falsely premised on the assumption that rates must be equal to costs. Although there is no requirement that a rate must be equal to the cost of a service, it is evident that costs are the major component of a rate. See R.C. 4909.151 and 4928.34. Reading R.C. 4928.34(A)(6) *in pari materia* with R.C. 4909.15, I would hold that if an unbundling plan results in an unbundled rate that is exponentially and unjustifiably more than the underlying cost of the service, the unbundled rates are unreasonable and the commission must make a reasonable reallocation. To hold otherwise would create an unreasonable result. Courts should avoid interpretations that yield unreasonable results. *State ex rel. Besser v. Ohio State Univ.* (2000), 87 Ohio St.3d 535, 721 N.E.2d 1044.

{¶ 43} I would find that CG&E's unbundling plan resulted in unreasonable rates for the Rate Schedule TS customers. I would remand the issue to the commission to re-examine its figures and reallocate the rates in a fair and reasonable manner. Accordingly, I concur in part and dissent in part.

PFEIFER, J., concurs in the foregoing opinion.

———————————

12

*Boehm, Kurtz & Lowry* and *David F. Boehm,* for appellant.

*Betty D. Montgomery*, Attorney General, *Duane W. Luckey, Steven T. Nourse* and *Thomas W. McNamee*, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

*James B. Gainer* and *Paul A. Colbert*, for intervening appellee Cincinnati Gas & Electric Company.

*Robert S. Tongren*, Ohio Consumers' Counsel, and *Ann M. Hotz*, Assistant Consumers' Counsel, for intervening appellee Ohio Consumers' Counsel.

—————————————