[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Ohio Power Co.*, Slip Opinion No. 2024-Ohio-2890.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-2890

IN RE APPLICATION OF OHIO POWER COMPANY FOR AN INCREASE IN ELECTRIC DISTRIBUTION RATES;

INTERSTATE GAS SUPPLY, L.L.C., APPELLANT; PUBLIC UTILITIES COMMISSION, APPELLEE; OHIO POWER COMPANY, INTERVENING APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Ohio Power Co.*, Slip Opinion No. 2024-Ohio-2890.]

*Public utilities—Electric-distribution rates—R.C. 4903.09—R.C. 4909.15— Findings of fact in Public Utilities Commission's orders regarding electric-distribution utility's application for distribution-rate increase were supported by evidence of record as required by R.C. 4903.09, and commission complied with R.C. 4909.15 by finding that the electric-distribution rates were just and reasonable—Orders affirmed.*

(No. 2023-0464—Submitted February 6, 2024—Decided August 1, 2024.)

APPEAL from the Public Utilities Commission, Nos. 20-585-EL-AIR, 20-586-EL-ATA, and 20-587-EL-AAM.

_____

BRUNNER, J., authored the opinion of the court, which KENNEDY, C.J., and FISCHER, DEWINE, DONNELLY, STEWART, and WINKLER, JJ., joined. ROBERT C. WINKLER, J., of the First District Court of Appeals, sat for DETERS, J.

**BRUNNER, J.**

{¶ 1} This appeal stems from intervening appellee Ohio Power Company's most recent electric-distribution-rate case. At issue is whether appellee, the Public Utilities Commission, authorized Ohio Power to recover through its distribution rates the costs it incurs to provide generation service. Retail electric-generation service is a competitive service under R.C. 4928.03, while electric distribution remains a noncompetitive service under R.C. 4928.15(A). Ohio law, including the state's electric policy as expressed in R.C. 4928.02, mandates that electric-distribution utilities—like Ohio Power—separate competitive generation rates from noncompetitive distribution and transmission rates. *See* R.C. 4928.05(A)(1), 4928.31(A)(1), and 4928.141.

{¶ 2} In the proceedings below, the commission found that the evidence was insufficient to enable it to determine whether Ohio Power is recovering any known and quantifiable generation costs through its distribution rates. *See In re Application of Ohio Power Co. for an Increase in Elec. Distrib. Rates*, PUCO No. 20-585-EL-AIR, 2021 WL 5496172, *52 (Nov. 17, 2021); *In re Application of Ohio Power Co. for an Increase in Elec. Distrib. Rates*, PUCO No. 20-585-EL-AIR, 2023 WL 2016753, *15 (Feb. 28, 2023).

{¶ 3} Appellant, Interstate Gas Supply, L.L.C. ("IGS"), a competitive retail electric-service ("CRES") provider, which does business in Ohio Power's service territory, argues on appeal that the commission ignored uncontroverted evidence that Ohio Power is recovering generation-related costs through its distribution rates in violation of state law and the state's electric policy. IGS also argues that the

commission failed to support its decision with findings of fact based on the record evidence as required by R.C. 4903.09.

{¶ 4} As discussed below, IGS has failed to demonstrate reversible error. Therefore, we affirm the commission's decision.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. *Background on deregulation*

{¶ 5} In 1999, the General Assembly restructured Ohio's electric-utility industry to foster retail competition in the generation component of electric service and altered the traditional rate-based regulation of electric utilities by requiring separation of the three components of electric service—generation, transmission, and distribution. *See* Am.Sub.S.B. No. 3, 148 Ohio Laws, Part IV, 7962, 7992-8055 ("S.B. 3"). Before generation-service competition began, the three service components were priced as one, and electric utilities used the revenues from the bundled services to support their generation, transmission, and distribution expenses and investments. The separation, or unbundling, of service components was intended to allow customers to evaluate offers from CRES providers and to ensure that electric-distribution utilities would not subsidize the competitive generation portion of their businesses through their distribution rates. *See AK Steel Corp. v. Pub. Util. Comm.*, 95 Ohio St.3d 81, 83 (2002); *Migden-Ostrander v. Pub. Util. Comm.*, 2004-Ohio-3924, ¶ 2-4.

{¶ 6} With the advent of retail competition under S.B. 3, customers have the option of purchasing electric-generation service from a CRES provider—an act known as "shopping." Customers who choose not to shop for service from a CRES provider continue to receive generation service from their incumbent electric-distribution utility under a "standard service offer" ("SSO"), which is the generation rate charged to nonshopping customers. R.C. 4928.141. The SSO also serves as the default rate for shopping customers who must return to the electric utility for generation service when the shopping customer's CRES provider fails to

provide service. R.C. 4928.14. Electric utilities can establish their SSO for electric-generation service in one of two ways: through a "market-rate offer," R.C. 4928.142, or an "electric security plan" ("ESP"), R.C. 4928.143.

### B. A related proceeding: the approval of Ohio Power's fourth ESP

{¶ 7} In 2018, the commission modified and approved a stipulation authorizing Ohio Power to implement a new ESP for the period June 1, 2018, through May 31, 2024 ("the ESP 4 case"). *See In re Application of Ohio Power Co. for Authority to Establish a Standard Service Offer Pursuant to R.C. 4928.143, in the Form of an Electric Security Plan*, PUCO No. 16-1852-EL-SSO, ¶ 1 (Apr. 25, 2018). Among other commitments, Ohio Power agreed to file a distribution-rate case by June 1, 2020. *Id.* at ¶ 45.

{¶ 8} Ohio Power also proposed to establish a "competition incentive rider," which was intended to remove certain costs associated with providing SSO service (e.g., call-center, meter-reading, and information-technology-infrastructure costs) that potentially were being recovered from both shopping and nonshopping customers through its distribution rates. *Id.* at ¶ 103, 200. The competition-incentive rider was designed to reallocate those SSO-related costs from being recovered through Ohio Power's distribution rates to an additional charge to Ohio Power's nonshopping customers. *Id.* at ¶ 201-202, 209, 212. In conjunction with the competition-incentive rider, Ohio Power also sought approval of a companion rider—the "SSO credit rider"—which was designed to refund to Ohio Power's distribution customers any amounts that Ohio Power recovered through the competition-incentive rider. *Id.* at ¶ 103, 209. The two riders would be revenue neutral to Ohio Power but would increase rates for nonshopping customers who purchased SSO generation service from Ohio Power, while lowering rates for shopping customers who purchased generation service from a CRES provider. *Id.*

{¶ 9} The commission approved both riders but found that they should be implemented as placeholder riders, *id.* at ¶ 214, meaning that initially no costs

4

would be recovered through the competition-incentive rider or refunded through the SSO-credit rider. Given the lack of evidence, the commission required Ohio Power to conduct a thorough analysis as part of its next distribution-rate case to identify the actual costs associated with providing the SSO and its customer-choice program, which was implemented to promote customer shopping. *Id.* at ¶ 214-215. Following that review, the commission would determine whether any known, quantifiable generation-service costs were being collected by Ohio Power from all customers through its distribution rates and if so, whether those costs were clearly incurred by Ohio Power to support the SSO. *Id.* The commission noted that many of the costs at issue could be incurred by Ohio Power to support its generation service under either the SSO or the customer-choice program. *Id.* at ¶ 214. The commission thus concluded that additional analysis was needed to determine whether and how certain expenses should be reallocated through the competition-incentive rider and refunded through the SSO-credit rider. *Id.*

{¶ 10} As a final matter, the commission found that the competition-incentive rider was a misnomer, because it was not directly intended to promote customer shopping. *In re Application of Ohio Power Co. for Authority to Establish a Standard Service Offer*, PUCO No. 16-1852-EL-SSO, at ¶ 216. Accordingly, the commission changed the name of the competition-incentive rider to the "retail reconciliation rider."

## C. *The present case: the commission's review of Ohio Power's application for a distribution-rate increase*

{¶ 11} In June 2020, Ohio Power filed an application under R.C. 4909.18 to increase its distribution rates. In an effort to comply with the commission's directive in the ESP 4 case to identify and quantify its SSO costs and customer-choice-program costs, Ohio Power offered evidence from David Roush, its managing director for regulated pricing and analysis. Roush testified regarding the quantitative and qualitative analysis he had prepared of Ohio Power's costs

associated with providing SSO services and with providing services to shopping customers, all of which are being recovered through its distribution rates. However, the commission's staff and other parties to the proceedings—including IGS—objected to Roush's analysis, arguing that it was insufficient for determining whether and how these generation costs should be allocated between shopping and nonshopping customers.

{¶ 12} Thereafter, in March 2021, Ohio Power, the commission's staff, and 12 other parties agreed to a "Stipulation and Recommendation" that, if approved, would resolve all issues before the commission in the distribution-rate case. Relevant to the issues on appeal here, the stipulating parties recommended that the retail-reconciliation rider and the SSO-credit rider remain placeholder riders set at zero based on the staff's report and recommendation. IGS opposed the stipulation.

{¶ 13} In November 2021, the commission issued an opinion and order modifying and approving the stipulation. *In re Application of Ohio Power Co.*, PUCO No. 20-585-EL-AIR, 2021 WL 5496172, at *51, 61. Based on the commission's staff report and testimony from Ohio Power, the staff, and the Office of the Ohio Consumers' Counsel ("OCC"), the commission accepted the stipulation that Ohio Power continue the retail-reconciliation rider and the SSO-credit rider as placeholder riders set at zero. *See id.* at *50-52. According to the commission, the parties "expressed differing views regarding the potential quantification and allocation of costs between SSO and shopping customers," and Ohio Power's accounting and internal-tracking systems precluded a more thorough analysis of costs it incurs to provide the SSO and to support the customer-choice program. *Id.* at *52. As a final matter, the commission noted that IGS could assert in a future case that the riders should be populated, provided that a proper cost analysis is conducted as the commission contemplated in the ESP 4 case. *Id.* at *53.

{¶ 14} IGS filed an application for rehearing, challenging the commission's approval of the stipulation to continue the riders as placeholders. In January 2022,

the commission granted the application for rehearing, *In re Application of Ohio Power Co. for an Increase in Elec. Distrib. Rates*, PUCO No. 20-585-EL-AIR, 2022 WL 143838, *2 (Jan. 12, 2022), but in February 2023, the commission changed course, denied the application for rehearing, and affirmed its initial ruling, *In re Application of Ohio Power Co.*, PUCO No. 20-585-EL-AIR, 2023 WL 2016753, at *1, 13-21.

{¶ 15} IGS appealed. The commission submitted a merit brief in defense of its orders. Ohio Power was granted leave to intervene, *see* 2023-Ohio-2123, and filed a brief in support of the commission's orders.

## II. STANDARD OF REVIEW

{¶ 16} R.C. 4903.13 provides that a final order of the commission shall be reversed, vacated, or modified only when, upon consideration of the record, we are of the opinion that such order is unlawful or unreasonable. We have "complete and independent power of review as to all questions of law" in appeals from orders of the commission. *Ohio Edison Co. v. Pub. Util. Comm.*, 78 Ohio St.3d 466, 469 (1997). "[We] will not, however, reverse or modify a [commission] decision as to questions of fact where the record contains sufficient probative evidence to show that the [commission's] determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty." *Monongahela Power Co. v. Pub. Util. Comm.*, 2004-Ohio-6896, ¶ 29.

## III. DISCUSSION

{¶ 17} IGS raises four propositions of law, which it labels "assignments of error." None has merit.

### A. *IGS's First Proposition of Law: Did the commission allow Ohio Power to recover through its distribution rates the costs that it incurs to supply competitive retail electric-generation services?*

{¶ 18} IGS first argues that the commission has allowed Ohio Power to recover through its distribution rates the costs that it incurs to supply competitive retail electric-generation services, in violation of state law and the state's electric policy. *See* R.C. 4909.15 (requiring the commission to fix just and reasonable distribution rates); R.C. 4928.05(A)(1) (barring the commission from regulating competitive retail electric service supplied by an electric-distribution utility); R.C. 4928.02(H) (state policy prohibiting recovery of generation-related costs through distribution rates). According to IGS, the record before the commission contained "uncontroverted evidence" demonstrating that Ohio Power is recovering through its distribution rates at least $4.7 million in known and quantifiable costs that it incurs to provide SSO service. IGS maintains that the commission erred by not ordering Ohio Power to (1) populate the retail-reconciliation rider with rates to recover and reassign the $4.7 million in SSO costs to Ohio Power's nonshopping customers and (2) populate the SSO-credit rider as needed to refund the recovered amount to Ohio Power's distribution customers.

{¶ 19} The commission and Ohio Power counter that the record before the commission lacked sufficient data and analysis to show that generation-related costs are included in Ohio Power's distribution rates. They assert that without any evidence that known or quantifiable generation costs are included in the distribution rates, the commission had no basis on which to populate the retail-reconciliation rider and the SSO-credit rider.

{¶ 20} As discussed below, IGS has not demonstrated reversible error. Some background is necessary, however, before we address IGS's argument.

### 1. Background on Ohio Power's initial cost study filed in response to the commission's directive in the ESP 4 case

{¶ 21} IGS relies primarily on Roush's testimony to support its claim that $4.7 million in SSO costs should be removed from Ohio Power's distribution rates under the retail-reconciliation rider and refunded to all distribution customers under the SSO-credit rider. Ohio Power filed the transcript of Roush's initial prehearing direct testimony on June 5, 2020, in support of its application for a distribution-rate increase. Among other things, Roush's testimony was intended to serve as a response to the commission's directive in the ESP 4 case, by which the commission instructed Ohio Power to conduct an analysis of its costs to provide electric-generation service to nonshopping customers and to shopping customers—costs that are potentially being recovered through its distribution rates. Roush had conducted a quantitative and qualitative analysis to differentiate between certain SSO and shopping-service costs that are included in Ohio Power's distribution rates. Roush also computed rates that would serve to populate the retail-reconciliation rider and the SSO-credit rider.

{¶ 22} Several parties, including IGS, contested and criticized Roush's analysis. Ohio Power subsequently joined the parties to the joint stipulation in recommending that the rates charged under the retail-reconciliation rider and the SSO-credit rider remain at zero. Given the stipulation, Ohio Power did not offer Roush's initial prehearing direct testimony and cost analysis into evidence at the evidentiary hearing on the joint stipulation.

{¶ 23} During the evidentiary hearing, however, IGS introduced Roush's initial prehearing direct testimony and his cost analysis in support of its position that the commission should populate the retail-reconciliation rider and the SSO-credit rider. The commission admitted the portions of pages 11 and 12 of the transcript of Roush's testimony (IGS's exhibit No. 3) in which Roush testified regarding his analysis of the SSO and customer-choice-program costs as it relates to funding the retail-reconciliation rider and the SSO-credit rider. The commission

also admitted exhibit DMR-2 to Roush's prehearing testimony, which is a summary of Roush's cost analysis and proposed rider rates.

**{¶ 24}** Roush's initial prehearing direct testimony and analysis reflect that Ohio Power's distribution rates include $4.7 million in direct costs that it incurs to provide SSO service. The $4.7 million consists of (1) charges to Ohio Power that are required by Ohio law to fund the commission and the OCC, *see* R.C. 4905.10(A) and 4911.18(A), and (2) uncollectible expenses directly assignable to providing SSO service.

**{¶ 25}** The commission, however, rejected IGS's contention that Roush's testimony and cost analysis justified a finding that $4.7 million in generation-service costs should be removed from Ohio Power's distribution rates and collected under the retail-reconciliation rider and refunded to all distribution customers under the SSO-credit rider. *See In re Application of Ohio Power Co.*, PUCO No. 20-585-EL-AIR, 2023 WL 2016753, at *15. The commission, citing the commission's staff report and testimony from staff witness Craig Smith, an administrator with the commission's Reliability and Service Analysis Division of the Service Monitoring and Enforcement Department, found that the rider rates should remain at zero because Roush failed to include in his analysis "the complete evaluation of SSO and shopping costs as contemplated by the Commission in the *ESP 4 Case*." (Italics in original.) *Id.* According to the commission's staff report and the supporting testimony of Smith, Roush identified only a limited number of costs to be included in the riders and did not provide a detailed cost-of-service study differentiating costs or service between shopping and nonshopping customers. *Id.* The commission also noted that there was "a lack of granular cost of service information in [Ohio Power's] [accounting and] internal[-tracking] systems that preclude[ed] an accurate and verifiable accounting." *In re Application of Ohio Power Co.*, PUCO No. 20-585-EL-AIR, 2021 WL 5496172, at *52; *see also* 2023 WL 2016753 at *15.

**2.  IGS has not shown that the commission's findings based on the evidence of record were unlawful or unreasonable**

{¶ 26} IGS argues that Roush's initial prehearing direct testimony and cost analysis support a finding that Ohio Power is improperly recovering $4.7 million in SSO costs through its distribution rates.  According to IGS, the evidence was "uncontroverted."  This is inaccurate, however, because several parties before the commission—including IGS—submitted evidence challenging Roush's testimony and cost analysis.

{¶ 27} Moreover, the commission ultimately rejected Roush's initial prehearing direct testimony and cost analysis.  *See* 2021 WL 5496172 at *52; 2023 WL 2016753 at *45-50.  Yet IGS does not set forth any grounds contesting the commission's rejection of Roush's testimony and cost analysis.  Rather than challenging the commission's rejection of this evidence, IGS rests its argument on an undisputed legal conclusion: that Ohio Power is prohibited by state law and the state's energy policy from recovering generation-related costs through its distribution rates.  But IGS cannot prevail on its state-law and -policy claims without first demonstrating that the commission erred in rejecting Roush's testimony and cost analysis.  That is, absent a showing by IGS that the commission acted unlawfully or unreasonably in rejecting this evidence, there is no evidentiary support for IGS's allegation that the commission committed any statutory violations.

{¶ 28} A party that challenges commission-approved rates and charges has the burden on appeal to this court under R.C. 4903.13 of showing that the rates and charges are unjust, unreasonable, or unlawful.  *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.*, 51 Ohio St.3d 150, 154 (1990).  Because IGS has not shown any error in the commission's orders on this issue, it has failed to carry its burden on appeal.  Therefore, we reject IGS's first proposition of law.

***B. IGS's Second Proposition of Law: Did the commission violate R.C. 4903.09 in finding that SSO-related costs should not be allocated to the retail-reconciliation rider?***

**{¶ 29}** R.C. 4903.09 requires the commission to file "findings of fact and written opinions setting forth the reasons prompting the decisions arrived at, based upon said findings of fact." In its second proposition of law, IGS claims that the record does not support the commission's finding that there was "no basis upon which to conclude that [Ohio Power's] distribution rates include known, quantifiable costs that should be allocated to the [retail reconciliation rider]," *In re Application of Ohio Power Co.*, PUCO No. 20-585-EL-AIR, 2021 WL 5496172, at *52, and therefore the commission violated R.C. 4903.09. This argument lacks merit.

**{¶ 30}** IGS's argument is premised on its belief that the commission ignored uncontested evidence that shows that Ohio Power's proposed distribution rates would result in its collecting at least $4.7 million in generation-related costs. The commission did not ignore such evidence; the commission rejected it. As noted in our discussion of IGS's first proposition of law, the commission found that the evidence that IGS relies on here—namely, Roush's initial prehearing direct testimony and cost analysis—was insufficient to support a finding that $4.7 million in SSO-related costs should be removed from Ohio Power's distribution rates and redistributed to customers through the retail-reconciliation rider and the SSO-credit rider. Specifically, the commission found that two factors precluded an accurate evaluation of SSO costs and shopping costs embedded in Ohio Power's distribution rates: (1) Roush identified only a limited number of costs in his initial analysis and (2) Ohio Power's accounting and internal-tracking systems lacked accessible data regarding costs and services provided to shopping and nonshopping customers. *See* 2021 WL 5496172 at *51-52; *In re Application of Ohio Power Co.*, PUCO No. 20-585-EL-AIR, 2023 WL 2016753, at *15. In support of these findings, the

commission cited the commission's staff report and testimony from staff witness Smith, as well as other evidence from Roush.

{¶ 31} IGS acknowledges that the commission cited evidence from the record in support of its findings. However, IGS claims that the commission violated R.C. 4903.09 because the "uncontroverted evidence" supports a finding that Ohio Power is recovering $4.7 million in generation-related costs through its distribution rates.

{¶ 32} IGS misunderstands the test for determining the commission's compliance with R.C. 4903.09. The question under R.C. 4903.09 is not whether the record contained sufficient evidence to support a particular finding by the commission. *See In re Application of E. Ohio Gas Co.*, 2023-Ohio-3289, ¶ 28; *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 4 Ohio St.3d 107, 110, fn.5 (1983). Rather, R.C. 4903.09 requires the commission to provide this court with an adequate record so that we may determine how the commission reached its decision. *MCI Telecommunications Corp. v. Pub. Util. Comm.*, 32 Ohio St.3d 306, 311 (1987); *Allnet Communications Servs., Inc. v. Pub. Util. Comm.*, 70 Ohio St.3d 202, 209 (1994). The commission's orders must contain sufficient detail for us to determine the factual basis and reasoning relied on by the commission. *Tongren v. Pub. Util. Comm.*, 85 Ohio St.3d 87, 89 (1999); *Payphone Assn. v. Pub. Util. Comm.*, 2006-Ohio-2988, ¶ 32. As noted above, the commission's orders in this case contain ample record citations for this court to determine the factual basis for the commission's findings.

{¶ 33} In sum, IGS has not shown a violation of R.C. 4903.09. Therefore, we reject IGS's second proposition of law.

### C. IGS's Third Proposition of Law: Did the commission violate R.C. 4903.09 in rejecting evidence from IGS's witness Frank Lacey?

{¶ 34} In its third proposition of law, IGS contends that the commission violated R.C. 4903.09 when it rejected the cost analysis of IGS's witness Frank

Lacey, the president of Electric Advisors Consulting, L.L.C. Lacey provides policy- and market-related consulting services to advanced energy-management companies and end-use customers. In rebuttal to the cost analysis conducted by Roush, IGS submitted prehearing direct testimony from Lacey regarding his separate analysis of Ohio Power's generation-related costs. According to Lacey, Ohio Power's proposed distribution rates would result in Ohio Power's recovery of approximately $64 million in SSO-related costs, which he said should be reallocated through the retail-reconciliation rider and refunded to all distribution customers through the SSO-credit rider.

{¶ 35} The commission rejected Lacey's testimony on the ground that he failed to comply with the commission's directive in the ESP 4 case requiring an analysis of Ohio Power's cost of providing SSO generation service, as well as an analysis of costs incurred to support the customer-choice program, to determine whether any of those costs were being recovered by Ohio Power through its distribution rates. *In re Application of Ohio Power Co.*, PUCO No. 20-585-EL-AIR, 2021 WL 5496172, at *52. According to the commission, Lacey made no attempt to factor customer-choice-program costs into his analysis. *Id.* The commission found that because Lacey failed to provide a complete analysis of costs as was ordered in the ESP 4 case, there was no evidentiary support for his recommendation to fund the retail-reconciliation rider and the SSO-credit rider in the amount of $64 million. *Id.*; *In re Application of Ohio Power Co.*, PUCO No. 20-585-EL-AIR, 2023 WL 2016753, at *15.

{¶ 36} On appeal, IGS argues that the record does not support the commission's decision to reject Lacey's analysis on the ground that his analysis was incomplete. IGS's third proposition of law lacks merit.

**1. The commission's basis for rejecting Lacey's analysis is readily discernible from its orders**

**{¶ 37}** As noted above, in its orders, the commission explained that Lacey's analysis was rejected as incomplete because he had failed to factor customer-choice-program costs into his analysis as required by the commission's directive in the ESP 4 case. To meet the requirements of R.C. 4903.09, the commission's orders must show in sufficient detail the facts in the record on which they are based and the reasoning followed by the commission in reaching its decision. *MCI Telecommunications Corp.*, 32 Ohio St.3d at 312. Here, the commission complied with R.C. 4903.09 by citing the specific paragraphs of its order in the ESP 4 case in which it set out the requirement that any future analysis include costs attributable to the customer-choice program. 2021 WL 5496172 at *52. Moreover, the commission explained why it rejected Lacey's analysis and cited the evidence of record where Lacey admitted that he had not attempted to factor customer-choice-program costs into his analysis. *Id.* And that is all that R.C. 4903.09 requires.

## 2. This court lacks jurisdiction over IGS's remaining arguments under its third proposition of law

**{¶ 38}** IGS also alleges that the commission violated R.C. 4903.09 because the grounds on which it rejected Lacey's testimony lacked evidentiary support in the record. According to IGS, in the ESP 4 case, the commission required only Ohio Power to conduct an analysis of its SSO and customer-choice-program costs. IGS thus maintains that the commission erred in rejecting Lacey's analysis for his failure to comply with the directive in the ESP 4 case to conduct an analysis of customer-choice-program costs, because that order does not apply to IGS.

**{¶ 39}** IGS, however, did not raise this argument in its application for rehearing before the commission as required by R.C. 4903.10. It is well settled that setting forth specific grounds in an application for rehearing is a jurisdictional prerequisite for our review. *Consumers' Counsel v. Pub. Util. Comm.*, 70 Ohio St.3d 244, 247 (1994). Moreover, we strictly construe the specificity test set forth in R.C. 4903.10. *Discount Cellular, Inc. v. Pub. Util. Comm.*, 2007-Ohio-53, ¶ 59.

IGS's failure to specifically raise this issue in its application for rehearing before the commission deprives us of jurisdiction to consider the argument on appeal.

{¶ 40} In its final argument under this proposition of law, IGS alleges that the commission violated R.C. 4903.09 by finding that IGS was attempting to improperly relitigate an issue that was resolved in the ESP 4 case. The commission found that IGS's ongoing objection to the commission's directive in the ESP 4 case to analyze Ohio Power's customer-choice-program costs constituted an untimely attempt to challenge the commission's ruling in that case. *In re Application of Ohio Power Co.*, PUCO No. 20-585-EL-AIR, 2023 WL 2016753, at *17. The commission made this finding in its second rehearing entry, *see id.*, as IGS acknowledges. But IGS never filed a *subsequent* application for rehearing alleging error in the commission's analysis in its second rehearing entry. That means IGS never sought rehearing on this ground, so we lack jurisdiction to consider the argument now. *See Harris Design Servs. v. Columbia Gas of Ohio, Inc.*, 2018-Ohio-2395, ¶ 23.

### D. IGS's Fourth Proposition of Law: Did the commission violate R.C. 4903.09 when it deferred its decision to populate the riders to a future case?

{¶ 41} In its fourth proposition of law, IGS contends that the commission violated R.C. 4903.09 by leaving the rates set at zero for the retail-reconciliation rider and the SSO-credit rider and by unlawfully deferring population of the riders to a future case. IGS maintains that the commission's orders fell short of complying with R.C. 4903.09 because the commission relied solely on information contained in the commission's staff report, which it contends was insufficient to support setting the riders at zero and failed to address all material issues. According to IGS, reversal is warranted under *In re Application of FirstEnergy Advisors for Certification as a Competitive Retail Elec. Serv. Power Broker & Aggregator*, 2021-Ohio-3630, because this court found a violation of R.C. 4903.09 in that case under similar circumstances.

16

### 1. IGS's reliance on *FirstEnergy Advisors* is misplaced

{¶ 42} In *FirstEnergy Advisors*, the commission issued an order approving FirstEnergy Advisors' application to provide regulated utility services. *FirstEnergy Advisors* at ¶ 1. The commission based its decision solely on a report prepared by its staff. The staff report merely stated that FirstEnergy Advisors had provided staff with the information it had requested, that staff had reviewed that information, and that staff believed that FirstEnergy Advisors had met all the requirements for approval of its application. *Id.* at ¶ 24.

{¶ 43} We explained that the commission can adopt reports prepared by its staff and incorporate them into its orders but that to comply with R.C. 4903.09, those reports must contain sufficient factual findings and conclusions of law. *FirstEnergy Advisors* at ¶ 22. We held that the commission violated R.C. 4903.09 in two ways: First, neither the commission's order—nor the staff report that the commission adopted—explained how FirstEnergy Advisors had met the applicable legal requirements to provide regulated utility services. *FirstEnergy Advisors* at ¶ 24-25, 27. Second, the commission failed to cite any evidence in the record on which it based its decision. *Id.* at ¶ 25, 27.

{¶ 44} In contrast, the commission's orders in this case provide sufficient detail to enable us to determine how the commission reached its decision regarding the retail-reconciliation rider and the SSO-credit rider. The commission determined that the riders should continue as placeholders with rates set at zero based on the commission's staff report and recommendation. *See In re Application of Ohio Power Co.*, PUCO No. 20-585-EL-AIR, 2021 WL 5496172, at *51; *In re Application of Ohio Power Co.*, PUCO No. 20-585-EL-AIR, 2023 WL 2016753, at *14. In its report, the staff recommended that the riders remain at zero because Ohio Power had failed to examine all costs that it incurs to provide the SSO and to support the customer-choice program. According to the staff report, unless all such costs are identified as being included in distribution rates, the staff cannot determine

whether or how those costs should be allocated between shopping and nonshopping customers. The commission also cited testimony from staff witness Smith, who explained the staff's position and reiterated that the staff was unable to recommend just and reasonable rates for the riders given the lack of (1) a detailed cost-of-service study and (2) granular data regarding the allocation of costs and services between shopping and nonshopping customers. *See* 2023 WL 2016753 at \*15, 21. In short, contrary to IGS's claim, the commission's orders in this case suffer from none of the deficiencies that plagued the commission's bare-bones order that was at issue in *FirstEnergy Advisors*.

**2. IGS's remaining arguments do not require a different result**

**{¶ 45}** In the remainder of this proposition of law, IGS claims that the commission violated R.C. 4903.09 by failing to address several material issues. We find that IGS's remaining arguments lack merit.

**{¶ 46}** First, IGS claims that it presented evidence to the commission showing that the commission did not have the authority to authorize the recovery of generation-related-service costs through distribution rates and that such recovery "promoted adverse economic effects on consumers, competitors, and competition in the generation-service market." According to IGS, it presented these issues through witness testimony and its briefs but the commission did not address any of the legal or economic consequences of setting the riders at zero.

**{¶ 47}** IGS's claim of adverse legal and economic consequences hinges on its proving that Ohio Power is recovering generation-related costs through its distribution rates. But as already discussed, the commission rejected IGS's evidence on this point, and on appeal, IGS has failed to demonstrate that the commission erred in doing so.

**{¶ 48}** Second, IGS claims that the commission failed to determine that "the resulting distribution rates are just and reasonable" as required by R.C. 4909.15(E). According to IGS, the commission's staff report on which the commission relied in

18

its orders states that the staff could not determine whether rates were just and reasonable based on the initial cost-of-service study provided by Ohio Power. In addition, IGS contends that the commission violated R.C. 4909.15 when, instead of determining in this case whether the approved distribution rates were just and reasonable, the commission informed IGS that it could argue in favor of populating the riders in a future case.

{¶ 49} To the extent IGS is arguing that the commission failed to find that Ohio Power's distribution rates are just and reasonable, this argument lacks merit. The commission made this finding as required by R.C. 4909.15. *See In re Application of Ohio Power Co.*, PUCO No. 20-585-EL-AIR, 2021 WL 5496172, at *59-61. To the extent that IGS is arguing that Ohio Power's distribution rates are unjust and unreasonable under R.C. 4909.15 because the commission refused to fund the riders, that claim is rejected, because it is based on the faulty assertion that the evidence shows that Ohio Power is recovering generation-related costs through its distribution rates.

{¶ 50} Finally, IGS's argument that any reliance on the staff's characterization that the SSO and the shopping costs are distribution-related or should be socialized (i.e., paid by both shopping and nonshopping customers) also fails. We reject this argument because IGS does not identify where in the commission's orders the commission characterized such costs as distribution-related or found that they should be socialized.

## IV. CONCLUSION

{¶ 51} For the foregoing reasons, we affirm the commission's orders.

Orders affirmed.

_____

IGS Energy, Joseph Oliker, and Evan Betterton, for appellant.

Dave Yost, Attorney General, and John H. Jones, Thomas G. Lindgren, and Janet R. Gregory, Assistant Attorneys General, for appellee.

American Electric Power Service Corporation, Steven T. Nourse, and Michael J. Schuler; and Porter, Wright, Morris & Arthur, L.L.P., and L. Bradfield Hughes, for intervening appellee.

————————————